UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAVID BERGER and AMBER BERGER, individually and as Personal Representatives of the Estate; THE ESTATE OF WILLIAM SAGE BERGER,<br><br>                              Plaintiffs,<br><br>     v.<br><br>SPOKANE COUNTY, political subdivision of the State of Washington; OZZIE KNEZOVICH, individually and in his capacity as Sheriff of Spokane; SHAWN AUDIE and STEVE PAYNTER, individually and in their capacity as a Spokane County Sheriff; JOHN DOES 1-10,<br><br>                              Defendants. | NO:  2:15-CV-140-RMP<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT is a motion by all Defendants for summary

judgment, **ECF No. 24**, on Plaintiffs' claims brought under 42 U.S.C. § 1983 and

Washington state negligence law.  Having considered the parties' arguments, both

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 1

in briefing[1] and as presented at the oral argument hearing on January 10, 2017, and having reviewed the remaining record and the relevant law, the Court is fully informed.

## FACTUAL BACKGROUND

This case concerns an individual, William S. Berger ("Will"),[2] who became brain-dead during the course of his arrest by Spokane County Deputy Sheriffs on June 6, 2013. Will allegedly was in the midst of a mental health crisis and was actively resisting the deputies' attempts to restrain him up until losing consciousness and/or suffocating. Spokane County law enforcement responded to a call from a private gym that Will had caused a disturbance within the gym and remained outside. Deputies Shaun Audie and Steve Paynter employed tasers and, allegedly, a vascular neck restraint technique in the course of restraining Will. Will did not regain consciousness and, the next day, was removed from life support.

---

[1] Plaintiffs provided three videos as part of their exhibits. However, the Court could access only the audio and not the video Exhibit A of ECF No. 43.

[2] Without intending disrespect but to avoid confusion, members of the Berger family are referred to by their first names.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 2

The interaction generating the present lawsuit apparently lasted only approximately six minutes.  The context preceding and subsequent to Will's encounter with Audie and Paynter and the moment-to-moment details of the encounter are as follows.

Will was 34 years old, 6 feet 1 and a half inches tall, and weighed approximately 170 pounds at the time of the events in question.  He began to exhibit mental health issues when he was in high school.  Will's mental illness manifested as manic episodes at which point Will required medical intervention, including hospitalization and medication, to return to stability.  Will's family recalled that, prior to June 2013, Will had last exhibited symptoms of a manic episode while working abroad in South Korea in approximately 2010.

On the evening of June 4, 2013, Will had been removed from a jiu-jitsu martial arts facility in north Spokane after he began acting erratically, throwing a trash can around, rolling around in trash, removing his uniform, and sweating and breathing heavily.  As Will appeared to grow more agitated and aggressive, he retreated to a bathroom where he stripped naked, claimed to see God and other figures, and punched a hole in the wall.  Four to five customers helped the gym owner remove Will from the bathroom and restrain him until law enforcement arrived.  The responding officer handcuffed Will, rolled him onto his side, and summoned medics "since it was a medical issue."  ECF No. 42-4 at 3.  The jiu-jitsu gym's owner recalled that one of the officers observed that Will's behavior

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 3

signaled "excited delirium."  ECF No. 42-5 at 3.  Medics transported Will,

strapped to a gurney, to a hospital for treatment.  The gym owner informed law

enforcement that Will was no longer welcome at the gym.  Law enforcement

determined that, although Will was trying to attack people and damage property,

he did not hit anyone or cause any actual property damage and had not committed

a crime.

Upon hearing of Will's removal from the jiu-jitsu gym and hospitalization,

Will's father, William Berger, Sr., ("William, Sr."), traveled to Spokane from

across the state.  On the evening of June 6, 2013, William, Sr. dropped Will off at a

gym on Spokane's South Hill, OZ Fitness, with plans to return to pick Will up after

his workout.  William, Sr. recalled that Will seemed to be feeling better after

leaving the hospital.

While in the gym, Will became agitated over the course of his work out and

drew attention from others in the gym including the Oz Fitness staff by grunting

loudly, pacing around, chanting repetitively and semi-coherently, stomping his

feet, removing his shirt, and eventually punching the paper towel machine off of

the wall.  Between 6:56 and 7:16 p.m., two individuals from the gym called 911.

Gym employee Levi Sullivan reported, as recorded in the dispatch log: "High male

yelling at people. Broke items. No weapons. Has grabbed people. Medics not

needed. Male now in no shirt talking about the end of the world. Male towards the

entrance, has medical bracelet. Subject is now outside in the parking lot." ECF No.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 4

26-1 at 119 (abbreviations and missing punctuation in dispatch log replaced for clarity). A gym customer named Joe Bornstein called in at approximately 7:16 p.m., and his statements were recorded in the dispatch log as follows: "Subject has been pushing people and knocked stuff off the walls inside, is outside now, trying to get back in. . . . The male is currently outside in the front of the building. Has some kind of a medical bracelet on. Jumping up and down and is acting like he wants to fight people." ECF No. 26-1 at 119 (abbreviations and missing punctuation in dispatch log replaced for clarity).

The general manager of the gym, along with at least one customer, escorted Will from the gym. During the time before law enforcement arrived, Will remained in or around the gym's parking lot, in near constant movement. At least three of the people present feared that Will was charging at them when he ran in their direction, and Will repeatedly grabbed onto the collar of the shirt worn by the customer who had taken a lead in escorting him out.

Deputy Paynter was the first to respond to the 911 calls from the gym, at approximately 7:21 p.m., while there was still daylight although dusk was approaching. Paynter remembers the call he was responding to as informing him of "a disorderly subject at OZ Fitness that was—I think they said that he was attacking people and destroying things inside." ECF No. 26-1 at 55. The deputy initially pulled his marked patrol car up alongside the gym parking lot. Gym employees and patrons in the parking lot identified Will, who was near the street

corner at the time, as the person whom the calls concerned.  Will moved toward the front of the patrol vehicle, where he began to bounce on his feet, with his balled fists raised in front of him "like a boxer."  ECF No. 32-2 at 12.  The gym's general manager described Will's reaction to the arrival of law enforcement as "really, really excited," "jumping up and down . . . like a gremlin or something."  ECF No. 40-6 at 6.

Paynter exited his car and stood behind the open driver's door.  Will pounded on the hood of the patrol car, moved around the passenger side, and pounded on the trunk of the car before crossing the street toward a vacant parking lot, outside a vacant shopping center, on the west side of the fairly busy street transecting the vacant lot from the gym and gym parking lot.  Paynter recalls that he gave continuous voice commands to Will to stop what he was doing and get on the ground, or he would be tased.  Paynter further stated in his deposition that he tased Will before he ran across the street because the deputy felt "trapped" between Will and the open driver-side door.  ECF No. 32-2 at 12.  However, none of the witnesses who were viewing the events from or near the gym described seeing Will tased before he ran across the street.

Paynter immediately got back into his patrol car and made a U-turn into the vacant parking lot across the street to join Will there.  Paynter exited the vehicle and again warned Will to stop and informed him that he was there to arrest him.  When Will was unresponsive to the deputy's demand and again crouched into a

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 6

fighting-like stance, Paynter tased him. The taser did not immobilize Will, who was able to remove the taser probes.

Just after Paynter arrived in the vacant lot across from the gym, paramedic Haley Karnitz and her ambulance partner Julie Clayton drove by on their way between posts during their shift. *See* ECF No. 39-1 at 17, 22. Karnitz saw Will "waving his arms around, yelling and screaming; he was jumping up and down, laughing." ECF No. 39-1 at 22. Karnitz then saw Paynter tase Will, Will fall to his knees, and stand back up and pull the tasers off of his chest as he moved toward Paynter. As a result of what Karnitz saw from the ambulance, she put herself on the call without first being dispatched, out of concern for the safety of both Paynter and Will. Upon informing the American Medical Response (AMR) dispatcher, at 7:24 p.m., that she was placing herself on the call, Karnitz reported that the situation she was observing involved an "excited delirium patient." ECF No. 39-1 at 22, 24. The AMR responders stood by at a distance in the parking lot.

A second officer, Deputy Audie, was dispatched at the same time as Paynter and arrived after Paynter, Will, and the AMR responders were in the vacant parking lot across the street from the gym. Audie exited his vehicle and went directly to tase Will. Paynter simultaneously tased Will, and Will stiffened and fell to the ground "like a tree," ECF No. 33-4 at 8, hitting his head. When Will started to prop himself up on his elbow to rise up again, Audie tased him at close range

1   into his side.  Audie then tossed his taser aside and, along with Paynter went

2   "hands on" by engaging in a struggle to incapacitate Will on the ground.

3        Around the time that the Deputies went hands-on with Will in the vacant lot,

4   William, Sr. pulled up at the gym parking lot to retrieve his son after his workout.

5   Two women pointed him toward the events transpiring across the street, and

6   William, Sr., ran to the vacant parking area in time to see the struggle between the

7   deputies and his son in progress.

8        Just after Will fell to the ground after he was tased, the EMR responders

9   retrieved spinal precaution gear, including a collar, backboard, and gurney from

10  the ambulance and moved toward the deputies who were "on top of" Will by the

11  time the responders reached them.  ECF No. 33-4 at 3.  The responders offered

12  help, and Deputy Audie requested assistance trapping Will's arm under his leg.

13  After Karnitz moved Will's arm, she and Clayton alerted the deputies that Will did

14  not appear to be breathing.  Audie yelled at the responders to get out of the way,

15  swearing at them angrily.  ECF No. 42-3 at 6.  Karnitz recalled that Audie

16  threatened that if she and her partner did not retreat, they would be arrested.  ECF

17  No. 42-3 at 6.

18       The record is not clear regarding how Audie and Paynter restrained Will on

19  the ground.  It is undisputed that Will was on his stomach, face down.  The EMR

20  responders reported seeing Audie laying on Will's back, with his arm wrapped

21  around Will's neck in a choke hold.  A witness from a nearby apartment balcony

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 8

recalled seeing a deputy restrain Will with a knee on his head.  Audie recalled that he tried to control Will by applying a Lateral Vascular Neck Restraint ("LVNR") technique, first by wrapping his right arm around Will's neck and then transitioning to his left arm. Paynter called in a code 99, meaning a request for immediate additional assistance from all available law enforcement personnel, during the 2-3 minutes that Audie was struggling to apply the LVNR hold.

Audie maintained that Will somehow grabbed Audie's taser after Audie had discarded it on the ground and shocked Audie on his forehead, but no other witness or participant of the incident confirms that Will ever held or used the taser. Neither deputy reported Will to be exhibiting signs of excited delirium or any similar mental health crisis.  In addition, immediately after the incident, Deputy Audie estimated Will's weight as 230 pounds and his height as 6 foot 2 or 3 inches tall, ECF No. 32-5 at 4, even though the record reflects that Will was 6 foot 1 and 170 pounds, *see* ECF No. 34 at 2.

By 7:27 p.m., before the AMR responders had made it back to their ambulance as directed by Audie, and before any other officers arrived, Will had gone limp, and the deputies applied handcuffs. The deputies turned Will over, saw that his face was blue, and summoned the EMR responders back, explaining that Will had no pulse.  Audie began chest compressions, while the AMR responders initiated life-saving protocols. Although they restored a pulse, Will was declared brain-dead after being transported to the hospital.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 9

1    Law enforcement conducted an investigation of the incident, beginning

2    before Will was transferred to the ambulance. Spokane County Sheriff's

3    Department Sergeant Richard Gere, the Defensive Tactics Master Instructor for the

4    County, then conducted a use of force review of the deputies' actions. In addition,

5    the Deadly Force Review Board, composed of law enforcement officers and a

6    Spokane County Prosecutor, reviewed the incident.

7    An autopsy was conducted, and the forensic pathologist found that Will died

8    of "hypoxic encephalopathy due to cardiac arrest with resuscitation due to

9    application of restraint measures by law enforcement personnel including neck

10    compression due to mania with physical agitation." ECF No. 41-7 at 2. The

11    pathologist added that "[h]eart abnormalities in the form of tunnel coronary artery

12    and altered cardiac conduction . . . are given consideration as conditions

13    contributing to death." *Id.* He classified the manner of death as a homicide.

14    Spokane County has numerous policies addressing the use of force,

15    including policies specifically addressing the appropriate use of tasers, certification

16    requirements for officers who carry tasers, and the LVNR technique. The County

17    also maintains a policy regarding appropriate treatment of someone suffering from

18    excited delirium. Furthermore, the County provides training to its law enforcement

19    officers on the policies and the techniques that they describe. ECF Nos. 26-1 at

20    35-36, 68-1 at 32, and 94. Indeed, Deputy Audie is a certified instructor in the use

21    of LVNR. *See* ECF No. 69-1 at 3.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 10

Plaintiffs filed their complaint on May 28, 2015, alleging that Deputy Audie, Deputy Paynter, Spokane County, and Sheriff Knezovich violated Plaintiffs' constitutional rights under 42 U.S.C. § 1983.  In addition, Plaintiffs asserted a state law negligence claim against the individual Defendants and a negligence claim against Spokane County under *respondeat superior* theory.  Following extensive discovery between the parties, Defendants moved for summary judgment against Plaintiffs on all claims with respect to all Defendants.

## SUMMARY JUDGMENT STANDARD

Summary judgment exists principally to isolate and dispose of factually unsupported claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  Federal Rule of Civil Procedure 56(a).  A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit.  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The party asserting the existence of a material fact must show "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Id.* (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89(1968)).  The mere existence of a scintilla of evidence is insufficient to establish a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 11

1    The moving party bears the initial burden of demonstrating the absence of a

2    genuine issue of material fact. *See Celotex*, 477 U.S. at 323 (1986). If the moving

3    party meets this challenge, the burden then shifts to the non-moving party to "set

4    out specific facts showing a genuine issue for trial." *Id.* at 324 (internal quotations

5    omitted). The nonmoving party "may not rely on denials in the pleadings, but must

6    produce specific evidence, through affidavits or admissible discovery material, to

7    show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th

8    Cir. 1991). In deciding a motion for summary judgment, the court must construe

9    the evidence and draw all reasonable inferences in the light most favorable to the

10   nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 631-32. The Ninth Circuit

11   recognizes "that summary judgment is singularly inappropriate where credibility is

12   at issue." *S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1054-55 (9th Cir. 2008)

13   (*quoting SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir.1978)).

14   **ANALYSIS**

15   ***Qualified Immunity for Individual Officer Defendants***

16   Qualified immunity is "an entitlement not to stand trial or face the other

17   burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (internal quotes

18   omitted), *abrogated in part on other grounds by Pearson v. Callahan*, 129 S. Ct.

19   808, 817-18 (2009). Therefore, qualified immunity questions should be resolved

20   "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223,

21   232 (2009).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 12

When government officials invoke qualified immunity from suit, courts must decide the claim by applying a two-part analysis: (1) whether the conduct of the official, viewed in the light most favorable to plaintiff, violated a constitutional right; and (2) whether the right was clearly established at the time of the alleged violation. *See Pearson*, 555 U.S. at 232-36 (trial court judges should exercise their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). Thus, the constitutional violation prong concerns the reasonableness of an official's mistake of fact, and the clearly established prong concerns the reasonableness of the officer's mistake of law. *See Torres v City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011), *cert. denied by Noriega v. Torres*, 2012 U.S. LEXIS 215 (U.S., Jan. 9, 2012).

### *Whether a constitutional violation occurred*

#### Eighth Amendment

Plaintiffs allege that Paynter and Audie violated Will's right to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain under the Eighth Amendment. ECF No. 37 at 30. However, as Defendants point out, the Eighth Amendment's prohibition of cruel and unusual punishment "applies only 'after conviction and sentence.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Plaintiffs cannot make out an Eighth Amendment violation under their alleged facts which failed to state that Will had been convicted or

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 13

1    sentenced.  Therefore, Defendants are entitled to summary judgment on any of

2    Plaintiffs' claims based on the Eighth Amendment.

3                    Fourth Amendment

4        Before delving into the Fourth Amendment analysis, the Court notes that

5    Fourth Amendment rights, as a general rule, are personal rights that may not be

6    vicariously asserted.  In section 1983 actions, however, "the survivors of an

7    individual killed as a result of an officer's excessive use of force may assert a

8    Fourth Amendment claim on that individual's behalf if the relevant state's law

9    authorizes a survival action." *Moreland v. Las Vegas Police Dep't*, 159 F.3d 365,

10   369 (9th Cir. 1998) (citing 42 U.S.C. § 1988(a)).  The state's survival law must be

11   followed unless it is "inconsistent with the Constitution and the laws of the United

12   States." 42 U.S.C. § 1988(a).

13       In Washington, "[a]ll causes of action by a person . . . against another person

14   or persons shall survive to the personal representatives of the former . . . , whether

15   such actions arise on contract or otherwise."  Wash. Rev. Code 4.20.046(1).

16   Referred to as the "general survival statute, [Wash. Rev. Code] 4.20.046(1),

17   preserves all causes of action that a decedent could have brought if he or she had

18   survived."  *Otani ex rel. Shigaki v. Broudy*, 151 Wn.2d 750, 755-56 (Wash. 2004).

19   Therefore, Plaintiffs may pursue a Fourth Amendment violation as Will's personal

20   representatives.

21

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 14

An objectively unreasonable use of force violates the Fourth Amendment of the Constitution's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-96 (1989). A determination of objective reasonableness requires a "careful balancing" of two competing interests: "the nature and quality of the intrusion on the individual's Fourth Amendment interests" and the government's interests behind the use of force. *Graham*, 490 U.S. at 396. The inquiry takes into account that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. Therefore, the inquiry accepts that decisions may be made based on a misperception of the circumstances and using judgment influenced by the adrenaline of the moment. "Not all errors in perception or judgment, however, are reasonable." *Torres*, 648 F.3d at 1123. "While we do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor does the Constitution forgive an officer's every mistake." *Torres*, 648 F.3d at 1123 (*quoting Graham*, 490 U.S. at 397) (internal citations omitted).

The government's interest in the force used is measured by the following factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. The "'most important' factor under *Graham* is whether the suspect posed

an 'immediate threat to the safety of officers or third parties.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (*quoting Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

In assessing the totality of the circumstances informing an officer's conduct, the Court also may consider "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826. Other factors include the availability of less intrusive force, *Hughes v. Kisela¸* 841 F.3d 1081, 1085 (9th Cir. 2016), whether the officer warned the individual prior to using force, *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994), and whether feasible, less intrusive methods of effecting an arrest were available[3], *Bryan*, 630 F.3d 805, n. 15. Courts also may examine "whether it should have been apparent to the officer that the subject of the force used was mentally disturbed." *Hughes*, 841 F.3d at 1085 (citing *Bryan*, 630 F.3d at 831; *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001)).

The Ninth Circuit recently clarified and reiterated how the presence of mental illness may affect the balancing that a court must undertake. In *Hughes*, 841 F.3d 1081, police responded to a call alerting them that a woman had been

---

[3] The Court notes that law enforcement officers are not required to employ the least intrusive means so long as their actions fall within a range of reasonable conduct. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

acting erratically and hacked at a tree with a knife.  After officers arrived, the

woman exited her house carrying a knife.  *Id.* at 1084.  An officer shot her when

when she did not comply with police commands to drop the knife and continued to

move toward the person with whom she lived and who had requested police

assistance.  *Id.*

   The *Hughes* Court observed that the Ninth Circuit has "'refused to create

two tracks of excessive force analysis, one for the mentally ill and one for serious

criminals.'"  841 F.3d at 1086 (*quoting Bryan*, 620 F.3d at 829).  However, the

court emphasized that the Circuit also had "'found that even when an emotionally

disturbed individual is acting out and inviting officers to use deadly force to

subdue him, the governmental interest in using such force is diminished by the fact

that the officers are confronted . . . with a mentally ill individual.'"  *Hughes*, 841

F.3d at 1086 (*quoting Bryan*, 620 F.3d at 829, and omitting internal citation and

quotation marks).

   The Court begins by recognizing that the intrusions on Will's Fourth

Amendment interests were undoubtedly severe.  Will began his interaction with

Spokane County law enforcement in such a state of agitation and potential delusion

that he may not have understood what was happening as the incident progressed.

As a result of the interaction, Will lost his life.  Nevertheless, for purposes of a

qualified immunity analysis, the question of reasonableness is considered not from

1   the subject's viewpoint, but from the perspective of a "reasonable officer on the

2   scene." *Graham*, 490 U.S. at 396.

3         Beginning with the "most important" *Graham* factor for analyzing the

4   government's interest, *see George*, 736 F.3d at 838, the Court finds that a rational

5   jury could find that Will did not pose an *immediate* risk of harm to the deputies or

6   the public justifying deadly force.  Will was not wearing a shirt and was visibly

7   unarmed, removed himself from a crowded area to a vacant parking lot, and only

8   fought with the deputies after he had been tased multiple times, hit his head on the

9   ground, tased again, and was in the process of arguably being strangled by law

10   enforcement.  Before the police arrived, some of the tension and volatility of the

11   situation that began in the gym diffused after Will was successfully escorted

12   outside.  Accordingly, although the Court recognizes that Will's behavior posed

13   some threat, the record does not support that the risk of imminent harm by Will

14   justified such a swift and severe invasion of his Fourth Amendment interests.  *See*

15   *Deorle*, 272 F.3d at 1281 ("A desire to resolve quickly a potentially dangerous

16   situation is not the type of government interest that, standing alone, justifies the use

17   of force that may cause serious injury").

18         In addition, the severity of the crime was relatively low, consisting of minor

19   property damage and physically threatening behavior while in the gym.  Disorderly

20   conduct is a misdemeanor.  *See* Wash. Rev. Code 9A.84.030.  Even if the deputies

21   assumed that Will had assaulted individuals in the gym, the Ninth Circuit has

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 18

found in situations involving alleged domestic violence that "the circumstances are not such . . . to warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious" and that "the nature of the crime at issue [provided] little, if any, basis for the officers' use of physical force." *Smith v. City of Hemet*, 394 F.3d 689, 702-03 (9th Cir. 2005).  In short, there are no facts supporting that the deputies reasonably would have thought that Will was a violent felon.

As to the remaining relevant factors, it is dubious that Will posed a risk of flight.  Although the record indicates that Will was in near constant movement throughout the incident, he had remained in the vicinity of the gym parking lot for approximately twenty minutes before police arrived.

With respect to any warnings made to Will by Paynter or Audie, there is no indication that the officers attempted informal contact with Will to assess his condition before they tased him to subdue him and bring him under control. Paynter asserts that he immediately told Will that he was under arrest and to get on the ground immediately. At least one bystander corroborates that Paynter ordered Will to get on the ground and allow the deputy to arrest him.  However, the Court could find no corroboration of a warning.  Therefore, the question of what statements Paynter made to Will present a credibility determination that should not be resolved through summary judgment. *See Reeves v. Sanderson Plumbing*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 19

*Prods.*, 530 U.S. 133, 150 (2000) (a court considering a summary judgment motion "may not make credibility determinations or weight the evidence").

Finally, the deputies insisted that they did not view Will as being in a state of excited delirium. However, Plaintiff has put forth sufficient evidence to question whether the deputies' failure to notice the cues that Will was in the midst of some sort of psychotic break, as well as failure to observe that he was wearing a medical bracelet as noted and reported by several witnesses, was reasonable.

In conclusion, a rational jury could find that the factors considered in determining the government's interest in the use of force weigh in Plaintiffs' favor. Relevant credibility determinations and resolution of disputed factual contentions must be reserved for a jury.

Fourteenth Amendment

The Due Process Clause forbids the State from depriving individuals of life, liberty, or property without "due process of law." U.S. Const. amend. XIV.

In the Complaint, ECF No. 1, Plaintiffs David and Amber bring a substantive due process claim on behalf of Will, as personal representatives of his estate, and on behalf of themselves, as Will's brother and sister-in-law.

The Ninth Circuit has recognized that the Fourteenth Amendment protects a liberty interest for parents "in the companionship and society of their children." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). However, the Ninth Circuit has declined to recognize such an interest between siblings. *Ward v. City*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 20

*of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991).  Accordingly, David and Amber's due process claim fails as a matter of law because they did not have a constitutionally protected interest in companionship with Will under section 1983. *See Ward*, 967 F.2d at 284.

Plaintiffs' briefing on the instant summary judgment motion is silent as to any Fourteenth Amendment violation against Will.  The Court finds that the Fourth Amendment's reasonableness standard alone must address whether a constitutional violation occurred here.  "If a constitutional claim is covered by a specific constitutional provision . . .  the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (*quoting United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see also Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir. 1990) ("Claims arising before or during arrest are to be analyzed exclusively under the [Fourth Amendment's] reasonableness standard rather than the substantive due process standard . . .."); *accord Fontana v. Haskin*, 262 F.3d 871, 881-82 (9th Cir. 2001).

### *Whether the right was clearly established*

"[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.  The court's inquiry "must be undertaken in light of the specific context of the case, not as a

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 21

1    broad general proposition." *Saucier*, 533 U.S. at 201.   The incident concerning

2    the Court here occurred on June 6, 2013.

3        Defendants rely on the Supreme Court's recent decision in *City and Cty. of*

4    *San Francisco v. Sheehan*, 135 S.Ct. 1765 (2015), to make two separate

5    arguments: that any clarification arising out of *Sheehan* regarding whether the

6    Defendant deputies' conduct violated a right that was clearly established should

7    not be weighed in Plaintiff's favor because *Sheehan* was decided after the 2013

8    events at issue here; and, second, that *Sheehan* is almost directly on point and

9    shows that the Defendant deputies are entitled to qualified immunity from this suit.

10    Defendants read *Sheehan* to support their qualified immunity defense that there

11    was, and is, no clearly established right for law enforcement officials to

12    accommodate one's mental illness, and the Court agrees with that reading of

13    *Sheehan*'s holding.  *See* 135 S.Ct. at 1778.

14        However, Plaintiffs' complaint and the briefing does not have to be so

15    narrowly construed regarding the right that Plaintiffs assert was violated.  Instead,

16    the question of whether Defendants should have recognized that Will was in the

17    midst of a mental health crisis is one of a set of related questions going toward the

18    central issue of whether these deputies' behavior was objectively reasonable, and

19    whether their use of force was excessive, given the totality of the circumstances

20    facing them at the time.  *See Graham*, 490 U.S. at 397.  Notably, the officers' use

21    of force was not in issue in the Supreme Court's decision in *Sheehan*.  *See* 135

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 22

1  S.Ct. at 1775 ("We also agree with the Ninth Circuit that after the officers opened

2  Sheehan's door the second time, their use of force was reasonable").  The issue in

3  *Sheehan* was limited to whether the officers' failure to accommodate plaintiff's

4  mental illness rendered otherwise constitutional actions by the officers

5  unconstitutional.  *See Sheehan*, 135 S.Ct. at 1775.  That is not the situation in the

6  present matter.

7      Moreover, *Sheehan* is distinguishable on facts that go toward whether the

8  right that was violated was clearly established at the time of the incident.  The

9  plaintiff in *Sheehan* was holding a knife, had made specific threats against her

10  social worker, threatened to kill the officers, and forced the officers to retreat from

11  the confined space of her room into the hallway, another confined space compared

12  to the setting at issue here.  The officers in *Sheehan* first used pepper spray to try to

13  deter the plaintiff in that matter, and deployed potentially deadly force by shooting

14  the plaintiff, who survived, after the plaintiff continued to charge with a knife at an

15  officer who was cornered.  By contrast, the facts at issue here present a credibility

16  issue as to whether sufficient warnings were issued, or whether any other attempt

17  at communication was made, before Will was tased.

18      Additionally, it is undisputed that Will had no weapon, and could not have

19  easily concealed a weapon, because he was wearing only basketball shorts and

20  sneakers.  It also is undisputed that the deputies' encounter with Will occurred

21  primarily in a large, empty parking lot, near vacant buildings, before it was dark,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 23

thereby minimizing any possible risk to others.  Moreover, there is a question of fact as to how the deputies physically restrained Will after he was tased a second, third, and fourth time, while he was face down on the ground, which then goes to the legal question of whether that force was constitutionally justifiable.

In sum, Plaintiffs' argument that the deputies deployed excessive force against Will is not entirely dependent on Will's mental illness, nor is the main issue presented whether deputies should have known that they were constitutionally required to accommodate that mental illness.  Rather, well-settled authority in place before June 6, 2013, established that an officer may not reasonably deploy lethal force to apprehend a suspect where the suspect posed no immediate threat to the officer or others.  *See Wilkinson*, 610 F.3d at 550.  As discussed above, particularly given the counterfactual scenarios offered by the events of June 4 at the jiu-jitsu gym and by the nonviolent removal of Will from Oz Fitness by customers and staff earlier in the evening, a question of fact persists as to whether Audie and Paynter's intrusion on Will's Fourth Amendment interests was justified.

### *Municipal Liability*

Municipalities cannot be held liable under section 1983 under a *respondeat superior* theory.  *Monell v. Department of Social Servs.*, 426 U.S. 658 (1977).  Rather, a municipal entity may be liable if it had an official policy or longstanding practice or custom that caused an injury to be inflicted on the plaintiff.  *Monell v.*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 24

*Department of Social Servs.*, 426 U.S. 658, 694 (1977); *see also Hunter v. County of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011) (municipal liability may be shown through "evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished"). Alternatively, a municipality may be held liable for failing to adequately supervise the employees in question or for ratifying, after-the-fact, their actions. *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (ratification occurs when "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it"). Finally, municipal liability may be based on a failure to train, so long as the plaintiff is able to show that "(1) he was deprived of a constitutional right, (2) the [governmental entity] had a training policy that amounts to deliberate indifference to the [constitutional] rights of the persons with whom [its officers] are likely to come into contact, and (3) his constitutional injury would have been avoided had the [entity] properly trained those officers." *Blankenhorn*, 485 F.3d at 484 (internal quotations omitted).

Plaintiffs have not fleshed out through their opposition to Defendants' summary judgment motion any basis for *Monell* liability. The only support for ratification of the individual Defendants' actions that the Court finds in the record is the bare assertion of the Spokane County sergeant responsible for reviewing uses of force and overseeing training on defensive tactics, Mr. Gere, that he and the County's Deadly Force Review Board reviewed the events leading up to Mr.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 25

Berger's death.  Nor is there any support in the record that Spokane County maintains an unconstitutional custom, policy, or practice that caused Plaintiffs' injury.  Finding a lack of support for their claim, the Court grants summary judgment on Plaintiffs' *Monell* claims.

### Liability for Sheriff Knezovich in his individual capacity

Plaintiffs allege claims against Sheriff Knezovich in his official and individual capacity.  An "official capacity" claim against a government officer is equivalent to a suit against the governmental entity itself.  *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).  Therefore, Plaintiffs' "official capacity" claims against Knezovich depend upon the same theory of liability as their claims against the County and unnecessarily duplicate those claims.  *Soffer v. Costa Mesa*, 798 F.2d 361, 363 (9th Cir. 1986) ("After [*Monell*, 436 U.S. at 690] . . . suit may be brought directly against a local governmental unit, rendering suit against the individuals unnecessary unless they are sued in their personal capacity").

As to claims against Knezovich in his personal capacity, the parties agree that Spokane County Sheriff Ozzie Knezovich was not on site during the June 6, 2013, incident involving Mr. Berger.  A police chief or sheriff cannot be sued for vicarious liability for a constitutional violation committed by his subordinate(s) just as a municipality cannot be liable under section 1983 by way of *respondeat superior*.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007).  A

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 26

police chief, and thus a sheriff, may be held individually liable as a supervisor under section 1983: (1) for his own culpable action or inaction in the training, supervision, or control of his subordinates; (2) for his acquiescence in the constitutional deprivation of which the complaint is made; or (3) for conduct that showed a reckless or callous indifference to the rights of others. *Blankenhorn*, 485 F.3d at 485 (internal citations and quotations omitted); *see also Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998). If Paynter and Audie used excessive force, Knezovich may be liable if he either "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630) (internal quotations omitted).

As found above, Plaintiffs do not raise a genuine issue of material fact as to whether any policy or lack of training was a moving force behind a constitutional violation at issue in this case. Likewise, the Court does not find a genuine issue of material fact as to whether Knezovich is liable in his individual capacity. Just as Plaintiffs' factual allegations were insufficient to find either a plausible causal link between the policies and customs of Spokane County, there is also a lack of a plausible theory, sufficient facts, or evidence in the summary judgment record to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 27

1  connect the supervisory actions of Knezovich to the deputies' alleged use of force

2  against Will.

3  ***Negligence***

4      The elements of a negligence claim include duty, breach, causation, and

5  injury. *Keller v. City of Spokane*, 146 Wn.2d 237, 242 (Wash. 2002).  The parties

6  agree that a separate claim of negligence does not inherently conflict with

7  Plaintiffs' section 1983 excessive force claim.  However, Defendants argue that

8  Plaintiffs cannot avoid summary judgment on the negligence claim by setting forth

9  "the same argument relied upon in the excessive force claim."  ECF No. 66 at 19.

10     To the extent that Plaintiffs' negligence claim rehashes their *Monell* claims

11 against the County and the personal claim against Sheriff Knezovich, which the

12 Court determined are unsupported by the evidence, the Court agrees with

13 Defendants.  However, the Court finds that there is sufficient evidence in the

14 record for a factfinder to consider whether, if it is determined that Defendants

15 Audie and Paynter's actions did not amount to excessive force their attempts to

16 subdue Will amounted to a lack of care.  *See Carector v. City of Yakima*, No. 2:14-

17 cv-03004-SAB, 2015 U.S. Dist. LEXIS 57961 (E.D. Wash. Apr. 27, 2015)

18 (reaching the same result and reasoning, "A jury could find that either [the

19 Defendant] should have subdued her differently to avoid her head injury or should

20 have done something earlier to prevent the plaintiff from acting up).  Accordingly,

21

Plaintiffs' negligence claims against Audie, Paynter, and the County, under *respondeat superior*, may move forward.

### John Doe Defendants

This District's General Orders 84-37 and 13-37-1, read together, require the Court to review a complaint naming "Doe" Defendants to determine whether they shall remain as named parties. Plaintiffs named ten "John Doe" Defendants in their complaint, yet have failed to identify any of the John Does or offer any evidence to support any claims against John Does. Therefore, the Plaintiffs' claims against any Doe Defendants shall be dismissed.

Accordingly, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment, **ECF No. 24**, is **granted in part** and **denied in part** as follows:

1. Plaintiffs' section 1983 Fourth Amendment excessive force claims against Deputies Audie and Paynter shall proceed to trial;

2. Plaintiffs' negligence claims against Deputies Audie and Paynter, and *respondeat superior* claim against the County, shall proceed to trial;

3. Plaintiffs' Fourteenth Amendment due process claims are dismissed;

4. Plaintiffs' Eighth Amendment claims are dismissed;

5. Plaintiffs' *Monell* liability claims against the County and Sheriff Knezovich are dismissed; and

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 29

1    6.  All claims against Sheriff Knezovich in his personal capacity are

2    dismissed.

3    7.  Plaintiffs' claims against all Doe Defendants are dismissed

4    The District Court Clerk is directed to enter this Order, enter Judgment

5    accordingly, and provide copies to counsel.

6    **DATED** February 13, 2017.

7

8               *s/ Rosanna Malouf Peterson*
                ROSANNA MALOUF PETERSON
                United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ~ 30